UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TEDDY BILLIOT, MARY VERDIN, LIZA NAQUIN, TASHA DARDAR, JADE BILLIOT BERGERON, LANNY DARDAR, CANDACE HENDON, KELLY NAQUIN, LORETTA VERDIN, CASEY DARDAR, SHANA RAE DARDAR, AND JOAN BRUNET | CIVIL ACTION |
| Plaintiffs, | NO. 2:21-cv- |
| vs. | JUDGE: |
| THE TERREBONNE PARISH SCHOOL BOARD, THE TERREBONNE PARISH SCHOOL DISTRICT, PHILIP MARTIN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT, AND GREGORY HARDING, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE TERREBONNE PARISH SCHOOL BOARD | MAGISTRATE: |
| Defendants. | |

**COMPLAINT FOR MANDAMUS, DAMAGES, AND REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF**

1.      By this complaint, plaintiffs, Teddy Billiot, Mary Verdin, Liza Naquin, Tasha Dardar, Jade Billiot Bergeron, Lanny Dardar, Candace Hendon, Kelly Naquin, Loretta Verdin, Casey Dardar, Shana Rae Dardar, and Joan Brunet, parents of children presently attending the Pointe-aux-Chênes Elementary School, a school attended solely and only by Louisiana Native Americans and Louisiana Cajuns whose parents' first or second language is either Native American or other Louisiana French, assert claims and causes of action arising under the laws of Louisiana and of the United States and reserve the right to amend to allege other such claims and causes of action.

2.      Pointe-aux-Chênes Elementary School is being prematurely closed as of the end of the 2020-2021 school year by defendants, unjustly and without due process. PAC students will

1

suffer irreparable injury on account of their race, ethnicity, native language, or their desire to maintain their language and tradition. Plaintiffs have suffered denial of their rights under the Constitution and laws of Louisiana and of the United States and are and will be injured on account of the illegal and unlawful actions of the governmental and individual defendants. Plaintiffs seek immediate injunctive and mandamus relief to prevent the closure of the Pointe-aux-Chênes Elementary School with the establishment of statutorily mandated French Immersion School at PAC Elementary that will preserve their language and traditions which are unique and protected by law. Plaintiffs also seek damages. Plaintiffs are attaching affidavits and declarations whose purpose is to supplement and expand the following allegations. These should be considered a part of this complaint within the meaning of Rule 12(b)(6).

3.      As is set forth hereinafter, plaintiffs are entitled to actual and punitive damages and to an award of costs and attorney's fees

## JURISDICTION

4.      The original jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, and 1343(2). The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1368. Immediate injunctive and mandamus relief is requested.

## VENUE

5.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Eastern District of Louisiana in that all or a substantial part of the events, acts, and omissions giving rise to plaintiffs' claims occurred in it. Pointe-aux-Chênes Elementary School, the subject of this complaint, is located in this district, and the defendants reside in this district.

6.      Plaintiffs also reside in this district and have children who attended Pointe-aux-Chênes Elementary School, which is located in this district, until June 10, 2021.

7.     The Terrebonne Parish School Board (TPSB) and the Terrebonne Parish School District (TPSD) and the individual defendants are located in or reside in this district.

## PARTIES

8.     The named plaintiffs are all Native Americans whose children, until June 10, 2021, attended Pointe-aux-Chênes Elementary School. They may be described as follows:

a.     Teddy Billiot is a parent of A. B., a rising 4th grader. A. B. is presently a 3rd grader at PAC who suffers from dyslexia. Her teachers help her. Also, her parents bring her to tutoring once a week to help her with her studies;

b.     Mary Verdin is a parent of G. V., a rising 4th grade student;

c.     Liza Naquin is a parent of both N. and J., rising 4th grade students;

d.     Tasha Dardar is a parent of K. S., a rising 3rd grade student;

e.     Jade Billiot Bergeron is a parent of two students, A. B., a rising 2nd grade student and B. B., a rising 4th grade student. Mrs. Bergeron signed a petition to the school board for French immersion in in 2020;

f.     Lanny Dardar, Jr. is a parent of C. D., a rising 2nd grade student;

g.     Candace Hendon is a parent of C. G., a rising 1st grade student. Two other of her children are also students at PAC;

h.     Kelly Naquin is a parent of M. V., a rising 1st grade student;

i.     Loretta Verdin is a parent of D. V., a rising 1st grade student and B. V., a rising 2nd grade student;

j.     Casey Dardar is a parent of C. D., a rising 2nd Grade student. In 2020, Mr. Dardar signed a petition to the school board for French immersion;

k.     Shana Rae Dardar is a parent of P., a rising 4th grade student;

l.      Joan Brunet is a parent of N. B., a rising 2nd grade student. Mrs. Brunet signed the 2020 petition to the school board for French immersion.

9.      Defendants, the Terrebonne Parish School Board [TPSB] and the Terrebonne Parish School District [TPSD], are governmental entities acting under color of law.

10.     Philip Martin, individually and in his official capacity as superintendent of the Terrebonne Parish School District and Gregory Harding, individually and in his official capacity as President of Terrebonne Parish School Board, are acting and have acted under color of law.

## STATEMENT

11.     Discrimination in education under color of law, based on race, color, or national origin, violates Title VI of the Civil Rights Act of 1964, the Louisiana Constitution, the laws of Louisiana, and the Constitution and laws of the United States, including but not limited to 42 USC § 1983, and the Fifth and Fourteenth Amendments.

12.     The TPSB has discriminated against Native American children based on race, color or national origin and has discriminated against Cajun children based on national origin.

13.     Pointe-aux-Chênes Elementary School ("PAC Elementary") is located in Terrebonne Parish, Louisiana.

14.     The TPSB qualifies for and receives federal funding to supplement other programs serving students at PAC Elementary. These programs include Title I Poverty and Migrant Education, Title VI Indian Education, the USDA child nutrition program, and others.

15.     PAC Elementary's student body is 70% Native American and approximately 30% Cajun. Almost all of these families are of Louisiana French-speaking heritage and national origin(s).

16.     PAC Elementary has the highest ratio of Native American students of any elementary school in Terrebonne Parish and in the State of Louisiana.

17.     Native American children, including the children of the plaintiffs, that attend or attended PAC Elementary are primarily from the Pointe-au-Chien Indian Tribe and the Isle de Jean Charles Biloxi-Chitimacha-Choctaw Tribe.

18.     The Pointe-au-Chien Indian Tribe is a state recognized Indian Tribe that has occupied the Terrebonne Basin since time immemorial. The Tribe's members speak a dialect of French known as "Indian French" that is unique to Native Americans in the Terrebonne Basin.

19.     The Isle de Jean Charles Biloxi-Chitimacha-Choctaw Tribe is a state recognized Indian Tribe located in Terrebonne Parish. The Tribe's members speak Indian French.

20.     Cajun is a unique ethnic group in Louisiana used to describe the descendants of the Acadian settlers of French heritage who relocated to Louisiana after being expelled from Canada and integrated into Louisiana's French-speaking community. Louisiana (or Cajun) French is a fundamental part of their heritage, culture, and identity.

21.     Louisiana French is a language spoken by the Native American, Creole, French, and Cajun populations of Louisiana who descend from the original residents of the State from before the Louisiana Purchase.[1] Each group has a distinct dialect. French has been spoken by millions of Louisiana residents since Louisiana's admission to the Union. French speakers, particularly native French speakers, have experienced both *de jur*e and *de facto* discrimination from State and parochial governments and from private actors, although there have been recent State efforts initiated to prevent the language's disappearance, partially to compensate for historical suppression.[2]

---

[1] https://books.google.com/books/about/Dictionary_of_Louisiana_French.html?id=vw5TIVBcNsIC

[2] https://heinonline.org/HOL/LandingPage?handle=hein.journals/louilr46&div=63&id=&page= ; https://link.springer.com/chapter/10.1007/978-1-4757-5278-6_7

22.     Terrebonne Parish is part of the Acadiana Region of Louisiana recognized by the Louisiana State Legislature for its unique French-speaking heritage.[3]

## THE SAD HISTORY OF RACE, COLOR & NATIONAL ORIGIN DISCRIMINATION AGAINST FRENCH-SPEAKING NATIVE AMERICAN AND CAJUN STUDENTS

23.     The decision to close PAC Elementary School and to deny establishment of the requested French Immersion Program continues a pattern and practice of discrimination against Native American and Cajun children.

24.     The TPSB has a long history of denying educational opportunities to Native American children.

25.     For decades, the TPSB denied public education opportunities to Native American children from Pointe-aux-Chênes and Isle de Jean Charles at a standard equal to public education opportunities offered elsewhere in Terrebonne Parish.

26.     The TPSB did not provide middle or high school education for students from Pointe-aux-Chênes until the late 1960s, after parents from Isle de Jean Charles sued the Terrebonne Parish School Board. This Court ordered that all grades be desegregated by 1967.

27.     Prior to integration, Indians from Pointe-aux-Chênes did not have the opportunity to attend middle school or high school in Terrebonne Parish. In 1963, Indian parents filed a lawsuit against the TPSB that resulted in integration of the schools. Although these lawsuits resulted in decrees that required census and other reports to be sent to this Court, reports by the TPSB have been discontinued without authorization from this Court.

---

[3] H.Conc.Res. 496 (La. Leg. 1971).

28.     When integration finally occurred, Indian students attending Terrebonne Parish schools, including PAC Elementary, were subject to discrimination from teachers, staff, and other students.

29.     At the time of integration, Native Americans in Terrebonne Parish primarily spoke French. Students were punished for speaking Indian French in school.

30.     Many of the Native American children dropped out of school due to racism and discrimination toward them.

31.     As stated in PAC Elementary's 2015 Blue Ribbon School application, "Prior to 1963, Native American children were not allowed to be educated in the public schools and attended 'Indian Schools', most of which only went up to the seventh grade. For decades, Native American children were educationally underserved and the community suffered from the wounds of their educational neglect." PAC Blue Ribbon App 2015.

32.     There is also a long history of state-sanctioned national origin discrimination against Cajuns in Terrebonne Parish, especially through denigration of their Louisiana French language. While Louisiana's Constitutions in the 19th Century were published in both English and French and secured various rights for French speakers in the public sphere, a vicious campaign of state-sanctioned discrimination was conducted in the 20th century to eradicate the language and assimilate the Cajun, Creole, and Native communities who spoke the French language — notably through banning French language education.[4]

---

[4]

https://www.jstor.org/stable/393154?casa_token=aaPeS4sEdW4AAAAA%3AXSVoWCiRMOcLGngNDnJlyzwMYCIXxj7YtQSgW4kJ_I9RmVUVNT7KMnTA8etvnpOZfduHFTOJe-UCJVXZ0tzN40QpiwYqGBsb0Z8YD-Vre-Cyf4kCWhQ7-A&seq=1#metadata_info_tab_contents

33.     The Louisiana Constitution of 1921 required that public education be conducted in English and thus banned French-language-medium education. This provision was removed from the Louisiana Constitution of 1974, but the 1921 constitutional mandate had a significant impact on social norms especially among educators so that discrimination against Cajun and Native American students in the classroom for speaking French continued into the late 1970s and 1980s[5] and continued in forbidding the speaking of French at PAC Elementary.

34.     A cultural renaissance around the French language and Cajun and Creole culture emerged in the late 1960s, 1970s, and 1980s, leading to the creation of a state agency, the Council for the Development of French in Louisiana ("CODOFIL"), and the establishment of a network of French language immersion programs. There are currently approximately 40 French language immersion programs across the State supported by CODOFIL, the Louisiana Department of Education, and international partner governments.

35.     Despite statutory laws and constitutional provisions mandating otherwise, the TPSB, and the TPSD prevented children from speaking Indian French or Cajun French in schools through the 1970s and even until the present.

36.     The TPSB and TPSD have continued to deny access to state-supported French language educational programs for its French-speaking Native American Tribes despite Tribal efforts to initiate an immersion program and despite verbal assurances from defendants that are described in the attached affidavits and on which plaintiffs reasonable relied to their detriment.

---

[5] https://link.springer.com/chapter/10.1007/978-1-4757-5278-6_7 ;
https://www.jstor.org/stable/399166?casa_token=sJ4Ca4RuD_wAAAA%3Aqge7ViqbkJ5BFEeVH1bTYsy0dDp
MbzFGcW5hI6wDRBGbCrZhn_1-G1Ugfjpt-
hhw9xDfkCN2os83aGJMh6WljAy6eoS9w5KfQ_hL1XChP2JYJGWe1GEj_sag&seq=1#metadata_info_tab_conten
ts

37.     This legacy of discrimination and suppression of the French language in Terrebonne Parish schools has negatively impacted the educational attainment of Native American children in Terrebonne Parish as well as their cultural heritage. This legacy of discrimination and suppression of the French language in Terrebonne Parish schools has contributed to many Native American students dropping out of school to avoid discrimination.

38.     Suppression of the French language in Terrebonne Parish schools has also negatively impacted the cultural heritage of Cajun students.

39.     As a result of the legacy of discrimination, Louisiana French (including both its Indian French and Cajun French dialects) has become an endangered language in Terrebonne Parish.

## IMPORTANT OF POINTE-AUX-CHÊNES SCHOOL

40.     Pointe-aux-Chênes is an unincorporated community located in Terrebonne Parish.

41.     PAC Elementary School has become a core part of the education of Native American children in the community and has incorporated cultural practices and history into its pedagogical model. This has resulted in positive rates of academic achievement for Native American children.

42.     In 2004, the Principal of PAC Elementary testified in support of recognition for the Pointe-au-Chien Indian Tribe and the Isle de Jean Charles Biloxi-Chitimacha-Choctaw Tribe. The Pointe-au-Chien Indian Tribe and the Isle de Jean Charles Biloxi-Chitimacha-Choctaw Tribe have come to rely on PAC Elementary as a critical part of their children's' educational fulfillment. It instills confidence in the children, both academically and culturally.

43.     "Traditions and culture run deep at Pointe-Aux-Chênes (PAC) Elementary. Parents and the Community partner with our school as vital stakeholders, preparing students for their future as stewards in this distinctive bayou community. The Parent Teacher Community, Native

American tribal leaders, and community business owners all play a part in enriching the lives of the students of PAC. They provide activities and presentations that not only prepare students for future careers but also develop a knowledge and sense of belonging for the rich culture into which they were born." PAC Blue Ribbon App 2015.

44.     PAC Elementary School is a pillar of the community and creates social and community cohesion.

45.     In the Environmental Impact Statement for the Morganza levee project, the Terrebonne Parish Levee Board noted that community stability and cohesion were bolstered by libraries, schools, and places of worship. "The presence of social institutions such as libraries, places of worship, and schools provide residents an opportunity for civic participation and engagement which increases community cohesion."

46.     The last segment of the Morganza-to-the Gulf Levee Project is scheduled to be completed by 2023 and will include lower Pointe-aux-Chênes.

47.     In May 2020, the Terrebonne Parish School District's Risk Manager recognized the importance of schools to community stability: In rural areas like Terrebonne, he noted, "generations of families pass through a school's halls. Schools don't just serve to educate students; they are often the only community center." The population effects, Mr. Moore said, cut both ways. "(It's) almost like a death spiral: Once you lose your school, you lose your population as well."

48.     In 2019, defendant Superintendent of Schools Philip Martin of the Terrebonne Parish School District told the Pointe-au-Chien Indian Tribe that there was no plan to close the PAC Elementary School. Here again, plaintiffs detrimentally relied on the truth of this statement, thought they had more time, and did not undertake litigation in reliance on this assurance.

49.    There are five bayous in lower Terrebonne Parish, and each bayou has an elementary school.

### CLOSURE OF THE POINTE-AUX-CHÊNES ELEMENTARY SCHOOL

50.    On March 11, 2021, three officials from the Terrebonne Parish School Board traveled to PAC Elementary School to inform the teachers and staff that PAC Elementary would be closing and that new positions would be offered at other schools in the parish beginning with the 2021 school year.

51.    On March 16, 2021, Superintendent Philip Martin recommended to one of the TPSB committees that the School Board close PAC Elementary.

52.    On April 13, 2021, the Terrebonne Parish School Board, despite serious public, state governmental, and academic objection, voted to close the PAC Elementary School and transfer its students to Montegut Elementary School.

53.    The Terrebonne Parish School Board made no outreach attempts to parents of PAC Elementary students prior to the April 13th vote to close the school.

54.    No financial or other reasons or any other non-racial or non-discriminatory justification were then or have now been given as to why the TPSB was choosing to close the school. Falsely lowered demographics were the only rationale cited. One school board member, Vice President Maybelle Trahan, specifically cited the racial composition of the school as a motivation. In particular, she expressed that she had felt socially isolated as a result of attending the school as a child and she did not want the children currently living in Pointe-aux-Chênes to go through what she went through. She noted that she did not meet a black person until she went to high school — several decades ago when race relations were dramatically different in the parish.

55.    Maybelle Trahan attended the white school in upper Pointe-aux-Chênes during segregation. She allowed her children to attend the school once it was integrated, and she has never

done anything to address the alleged social harms faced by PAC students for attending an integrated, local community school.

56.    Ms. Trahan's statements in support of closure ignored the success of students who have attended PAC Elementary School. She also ignored that PAC Elementary today is a racially integrated school with a critical mass of both white Cajun and Native American students proportionally reflective of the surrounding community.

57.    While TPSB members Lagarde and Harding did not explicitly cite the racial composition as the rationale for their decision to close PAC Elementary, they conceded that the School was majority Native American and that the decision thus primarily affected a majority-Native population. While acknowledging the racial impact of the decision, Harding, the Board President, argued that the school closure was minor compared to the racial segregation experienced by Black citizens in schools and other public institutions during the Jim Crow era.

58.    The TPDB performed no analysis on whether the closure of the school would negatively or positively impact PAC students or students in the broader school system.

59.    School Board member Matthew Ford stated during the TPSB meeting in April that there was no justification for closing the school and that no analysis had been provided to the school board members.

60.    Defendant, Superintendent Philip Martin, publicly stated that closing the school was not about money.

61.    A school board member told Pointe-au-Chien Tribal leaders that 70% Native American population in one school, Pointe-aux-Chênes, was too high.

62. The Terrebonne Parish School Board has not claimed that closing PAC was out of necessity. The documents produced as a result of public records requests show no non-discriminatory reason for closing PAC Elementary or for rushing its closing to June 10, 2021.

63. PAC is a blue-ribbon school partly based on its relationship in and with the community and the rate at which Native American children thrive at the school.

64. The Louisiana Legislature has threatened to deny the TPSB any COVID relief funding if it decides to close PAC School.

65. The Louisiana Legislature has allocated $1 million to keep the PAC Elementary school open, but the TPSB has not changed course or altered its decision. Rather it has accelerated closure so that "not one piece of paper will remain at PAC" as of June 10, 2021. This was done so that injunctive relief would be more difficult for this Court to provide.

66. According to the TPSB, the cost savings to close PAC School, including salaries of teachers and staff who are reassigned to other schools, is less than $1 million.

67. Because the TPSB failed to give any warning to parents or Tribes, and in fact told the Tribes in 2019 that it had no intention of closing PAC, closure of the school in April 2021 denied the Tribe and its members of the opportunity to establish a culturally appropriate charter school in time for the Fall 2021 semester.

68. The TPSB has made calculated decisions concerning PAC school which were intended to and did negatively impact Native American children.

69. Children from PAC Elementary will be sent to Montegut Elementary School, a majority white school that has no relationship with the Pointe-au-Chien Indian Tribe or the Isle de Jean Charles of Biloxi-Chitimacha-Choctaw Tribe.

70.     Moving the children from PAC Elementary School to Montegut threatens plaintiffs' children and all of the other PAC children's academic future, their cultural identity, and their emotional and social well-being.

71.     There are several special needs students at PAC Elementary, including some of plaintiffs' children. The TPSB provided no information on how these students will be impacted by the change. One student at PAC Elementary relies on a wheelchair and will not be sent to Montegut Elementary because the school is not handicap accessible. He will be separated from his family and his friends.

72.     On May 18, 2021, parent and plaintiff, ShanaRae Dardar, traveled to the School Board office to attend the committee meetings in order to provide an update to the school board on the efforts to establish a French Immersion Charter School, the funding from the state legislature, and to request that the TPSB delay the closure of the school in order to have time to get a charter school approved for the Cajun and Native American children in PAC. She was told that she did not have permission to speak at any of the meetings.

73.     On May 19, 2021, ShanaRae Dardar called the Terrebonne Parish School Board and asked to be placed on the agenda for the June 1, 2021 school board meeting. Ms. Dardar was informed that she was added to the agenda. She was not added to the agenda and was refused the opportunity to speak at the June TPSB meeting.

74.     Ms. Dardar unsuccessfully tried many times to contact the School Board President to discuss the school closure.

75.     Closing the PAC Elementary School for having too high of a Native American population harms the Native American students and serves no legitimate goal or purpose.

76.     No Native American serves on the Terrebonne Parish School Board.

77.     No Native American has ever been selected as a principal in a Terrebonne Parish School.

78.     The Terrebonne Parish School Board did not consult with the Tribes before it decided to close PAC Elementary.

79.     The Terrebonne Parish School Board did not consult with the parents of PAC Elementary School students prior to deciding to close PAC Elementary.

80.     In 2020, the Terrebonne Parish School Board approved a $1.5 million budget increase, for an addition to and renovation costs for Mulberry Elementary School in Houma costing $14.8 million dollars.[6] This school serves primarily white students; the student population is 74% white.[7]

81.     The TPSB demolished the Southdown Elementary School building and budgeted approximately $20 million to construct a new school.[8] Approximately 61% of the students at Southdown Elementary are African American.

82.     Closing PAC school Elementary will have a disparate impact on Native American children.

83.     Closing PAC Elementary continues TPSB's pattern and practice of racial discrimination against Native Americans.

84.     By removing a stable source of community cohesion, the TPSB seeks to destabilize a focal point within the community.

---

[6] https://www.houmatimes.com/news/terrebonne-school-board-approves-nearly-1-5-million-budget-increase-for-mulberry-addition-renovation/.

[7] https://www.publicschoolreview.com/mulberry-elementary-school-profile/70360

[8] https://www.greatschools.org/louisiana/houma/1833-Southdown-Elementary-School/#Race_ethnicity.

85.     The Pointe-au-Chien Indian Tribe and many other families are committed to multilingual and culturally sensitive education so that their children and grandchildren can continue the culture and traditions of their families, which they believe are important and unique. Closing the school will send the message that the students in the Pointe-aux-Chênes area do not matter, that their culture and lifeways are not valued, and that their educational attainment is unimportant.

## DISCRIMINATORY DENIAL OF FRENCH IMMERSION

86.     Under Louisiana's Immersion School Choice Law, if a requisite number of parents or legal guardians within the jurisdictional boundaries of a school district sign a petition to institute a French Immersion program at a school, the school board is obligated to respond to that petition. Legislative Act 361, Regular Session 2013, § (2)(a).

87.     This law was designed to charge families and local communities with taking the initiative to open immersion programs in order to secure their right to maintain their native language and culture. Indeed, one of the explicit purposes of the law was "to provide a better understanding of the state's social traditions and serve to promote, preserve, and develop our unique bilingual culture."[9]

88.     All children who attend PAC Elementary are from Louisiana-French-speaking families, both Cajun and Indian. Louisiana French is part of their respective cultural heritage.

89.     In 2018, the Pointe-au-Chien Indian Tribe submitted a French Immersion Petition to the Terrebonne Parish School Board requesting French immersion. The school board never acted upon or otherwise responded to the petition. The public records produced by the TPSB show that no action was contemplated or taken by the TPSB.

---

[9] https://law.justia.com/codes/louisiana/2014/code-revisedstatutes/title-17/rs-17-273.3/

90.     In January 2020, the Pointe-au-Chien Indian Tribe submitted another petition for French immersion, which at least two of plaintiffs here signed. Once again, the TPSB failed to act despite its affirmative legal obligation to respond. The public records produced by the TPSB show that no action was contemplated or taken by the TPSB.

91.     The School Board's failure to respond to the two French Immersion petitions submitted by the Pointe-au-Chien Indian Tribe and parents discriminates against Indian and Cajun children whose parents and guardians signed the petitions.

92.     Through email correspondence and formal statements made at the April 13, 2021 School Board meeting, representatives of CODOFIL, the Louisiana Department of Education, the Office of the Louisiana Lieutenant Governor (Billy Nungesser), and speaker Pro Tempore Tanner Magee have informed Terrebonne Parish School Board that there is funding, logistical support, and human capital available to support PAC elementary school.

93.     Numerous studies demonstrate that that French immersion enhances the educational and social outcomes (on top of language proficiency), especially for the most disadvantaged populations.[10]

94.     In furtherance of its effort to further assimilate Cajun and Indian children and to cause loss of their French language, the TPSB has failed and refused to offer language instruction in French to PAC students and failed to respond to the French Immersion petitions submitted by the Pointe-au-Chien Indian Tribe.

---

[10] https://www.utpjournals.press/doi/abs/10.3138/cmlr.63.5.655 ; https://www.utpjournals.press/doi/abs/10.3138/cmlr.63.5.605 ; https://www.tandfonline.com/doi/abs/10.1080/00437956.1971.11435629 ; https://www.jbe-platform.com/content/journals/10.1075/jicb.2.2.03gen

95.     When Terrebonne Parish finally integrated the schools in the late 1960s, the TPSB did not attempt, in any way, to build cultural and social capacity. Instead, the TPSB's policies were designed to suppress tribal identities and suppress the Indian French language.

96.     Culturally responsive teaching "affirms the backgrounds of the students, considers their cultures as strengths, and reflects and utilizes students' learning styles."

97.     The Terrebonne Parish School Board has discriminated against Native American students at PAC Elementary based on race, color or national origin and has discriminated against Cajun students at PAC Elementary based on national origin.

## INTENTIONAL AND WRONGFUL DISCRIMINATION BY THE TPSB, THE TPSD, AND THE INDIVIDAL DEFENDANTS

98.     The Terrebonne Parish School Board has a long pattern and practice of discrimination against Native American students on the basis of race, color, and national origin — including its initial denial of education to PAC Tribe and other Native American students, its subsequent mistreatment of Tribal students in its system, and its recent decision to close the majority-Native PAC Elementary School.

99.     Discrimination against Native American students on the basis of race, color, and national origin has an extensive history in Louisiana and in the broader United States. For instance, the federal Department of Education has taken numerous actions to reverse discriminatory practices and policies of local school districts, including those with a disparate impact on Native American students.

100.     The TPSB's decision to close PAC Elementary School was and is clearly discriminatory against Native students at PAC Elementary on the basis of their race, color, and national origin on multiple levels vis-à-vis their non-Native counterparts at other schools in the Terrebonne Parish School District. First, the School Board targeted for consolidation the only

majority-Native school in the parish and provided no financial or other justification for why the consolidation was necessary. Second, the School Board chose to close the majority-Native PAC Elementary, displacing its students to the majority-white Montegut Elementary, again providing no rationale and despite the former school arguably having superior facilities for hosting the larger student population. Third, the School Board chose to leave the town of Pointe-aux-Chênes as both the only majority-Native bayou and the only bayou community of the five principal bayous in Terrebonne Parish without any public school.

101.    There is clear evidence of intentional discrimination. The School Board Vice President was explicit in the racial motivation behind her vote to close the school, and at least two School Board members (including the Board President) verbally acknowledged the racial implications of the decision. While consolidating schools to achieve racial integration is a legitimate objective of local school boards, targeting an already-integrated school like PAC Elementary for its majority-Native racial composition (consistent with the composition of its surrounding community) constitutes illegal racial discrimination, particularly when the most segregated majority-white schools under TPSB's supervision have mostly not been consolidated for the purpose of desegregation.

102.    School closure decisions by school districts and states with discriminatory intents and/or impacts have been overturned by federal courts in Louisiana and across the country. As this Court ruled in *Hall v. St. Helena Par. Sch. Bd*., 197 F. Supp. 649, 657 (E.D. La. 1961), *aff'd*, 68 U.S. 515, 82 S. Ct. 529, 7 L. Ed. 2d 521 (1962):

> [Arbitrary school closure decisions] run afoul of the equal protection clause in [two] respect[s]… discriminating specifically against Negro school children… [while also] to discriminate geographically against all students, white and colored, in St. Helena or any other community where the schools are closed… Applying familiar principles to the admitted facts, that conclusion seems inescapable. Thus, it is clear enough that, absent a reasonable basis for so classifying, a state cannot

close the public schools in one area while, at the same time, it maintains schools elsewhere with public funds. And, since Louisiana here offers no justification for closure in St. Helena Parish alone, and no "state of facts reasonably may be conceived to justify it," except only the unlawful purpose to avoid the effect of an outstanding judgment of the court requiring desegregation of the public schools there, it seems obvious that the present classification is invidious, and therefore unconstitutional, even under the generous test of the economic discrimination cases. See *McGowan v. State of Maryland*, 366 U.S. 420, 425-428, 81 S. Ct. 1101, 6 L. Ed. 2d 393, and cases there cited.

103.    This Court concluded [*id.* at *659]:*

Applying the rule of *Brown* to geographical discrimination, "**All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle**." (Emphasis added.) *Brown v. Board of Education*, 349 U.S. 294, 298, 75 S. Ct. 753, 755, 99 L. Ed. 1083…. When the state provides a benefit, it must do so evenhandedly …. There can be no question about the actual inequality in educational opportunities that will follow closure of the public schools in St. Helena Parish…. One of the purposes of the Constitution of the United States was to protect minorities from the occasional tyranny of majorities. No plebiscite can legalize an unjust discrimination. "One's right to life, liberty, and property * * * and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185, 87 L. Ed. 1628. See *Boson v. Rippy*, 5 Cir., 285 F.2d 43, 45."

104.    In addition to intent, there are numerous significant dignity and material harms from school closure that clearly engender a disparate impact on the Native American students of PAC Elementary *vis-à-vis* their non-Native counterparts at Montegut Elementary, other bayou area public schools, and other schools in Terrebonne Parish. First, PAC's Native students have been told that they deserve less than other non-Native students given that their majority-Native school has been targeted for closure without justification. Second, PAC's Native students will lose the distinct cultural, emotional, and social support provided by attending a school run by and for their community. Third, PAC's Native American disabled students will face particular disruptions and suffer from inferior facilities at Montegut. Finally, PAC students will be negatively affected by the concentration of large numbers of students at Montegut Elementary School which has insufficient human and physical capital to adequately serve the consolidated student population.

20

105.    The State of Louisiana and the Terrebonne Parish School Board have a long pattern and practice of discrimination against Cajun French and Indian French students on the basis of national origin, specifically through official efforts to denigrate, prohibit the teaching and speaking of, and annihilate the Louisiana French language spoken by both groups.

106.    Language rights are protected by Title VI, Article 1: Section 3 and Article 12: Section 4 of the Louisiana Constitution, and the 14th Amendment of the U.S. Constitution. Language is a key marker of national origin. As such, decisions with an intentional motivation to materially harm — as well as those having a disparate impact on — a specific language group of particular national origin(s) are impermissible under state and federal law.[11]

107.    As the Supreme Court ruled in *Meyer v. Nebraska*,[12] "knowledge of [another] language… has been commonly looked upon as helpful and desirable…. [The foreign language teacher's] right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the [14th] Amendment."

108.    Additionally, EEOC guidance states that, in the case of workplace discrimination, "a restrictive language policy violates Title VII if it is adopted for discriminatory reasons, such as bias against employees of a particular national origin. Thus, it would be unlawful disparate treatment to implement an English-only rule in order to avoid hearing foreign languages in the

---

[11] https://link.springer.com/article/10.1007%252Fs11606-007-0366-2 ;
https://heinonline.org/HOL/LandingPage?handle=hein.journals/collsp17&div=9&id=&page=

[12] *Meyer v. Nebraska,* 262 U.S. 390, 400-4-1, 43 S. Ct. 625, 627, 67 L. Ed. 1042 (1923)

Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto. The calling always has been regarded as useful and honorable, essential, indeed, to the public welfare. Mere knowledge of the German language cannot reasonably be regarded as harmful. Heretofore it has been commonly looked upon as helpful and desirable. Plaintiff in error taught this language in school as part of his occupation. His right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the amendment.

workplace."[13] It is discriminatory for the TPSB to deny French immersion education required by state law and close PAC Elementary to prevent the speaking of the Louisiana French language, thus building on a decades-long history of language discrimination in the school system.

109.    The TPSB's decision to close PAC Elementary — home to a population of almost exclusively Louisiana-French-speaking families — in conjunction with its denial of the implementation of French language education at PAC Elementary as required by state law constitutes illegal language — and thus national origin — discrimination under Title VI. Given the absence of an official language in Louisiana and the United States as well as the existing legal framework within Louisiana for implementing heritage language education, the TPSB's denial of Cajun and Indian French families' rights for their children to be educated in their native language unfairly singles out a language group of particular national origins, *i.e.,* French, Acadian, and Native American, and excludes them from educational programming provided to language groups of other national origins. Specifically, it is discriminatory for the TPSB to provide English-speaking education to families of English-speaking national origins and to likewise take advantage of state and federal programs for Spanish-language ESL (English-as-a-Second Language) programs for families of Spanish-speaking national origins while failing to implement similarly feasible state-supported (and, in this case, state-mandated) programs for families of Louisiana-French-speaking national origins.

---

[13] https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518821

## FIRST CAUSE OF ACTION
## VIOLATIONS OF FEDERAL STATUTORY AND CONSTITUTIONAL LAW

110.    Discrimination in education based on race, color, or national origin under color of law violates Title VI of the Civil Rights Act of 1964, the Constitution and laws of the United States, including but not limited to 42 USC § 1983, and the Fifth and Fourteenth Amendments.

111.    As stated in the forgoing and as set forth in the affidavits and declarations filed herewith, defendants failed to provide either procedural or substantive due process to the plaintiffs in discriminating against their children on account of race and ethnicity, in refusing to permit them to speak French at PAC Elementary, by closing and rushing the closure of PAC Elementary, and by denying their petition and the petitions of others for a French Immersion School. Defendant Martin deliberately prevaricated in order to accomplish unworthy and unlawful goals. These actions were arbitrary and capricious and lacked any pretense of constitutionally adequate substantive or procedural due process.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF LOUISIANA CONSTITUTIONAL LAW

### A. The Defendants Violated the Louisiana Constitutional Protections
### Against Racial, Ethnic, and Linguistic Discrimination

112.    The Louisiana Constitution of 1974, which provides greater protection against racial, ethnic or linguistic discrimination than the U.S. Constitution, was enacted to make it abundantly clear that the actions of "government," including the actions described above undertaken by the defendants, are duty-bound and obligated to protect the rights of the individual and for the good of all including, *inter alia,* the protection of all of the people's race, affiliations, birth and culture. See Article I § 1 and 3, Declaration of Rights.

113.    The Louisiana Constitution 1974, Right to Individual Dignity Art. I. § 3. provides a legal format for the revocation of any law or action by any governmental body that discriminates

against a person because of race and prohibits the arbitrary or unreasonable enactment of a law that adversely impacts a person because of inter alia birth, culture or affiliations.

114.    To erase blatant discrimination against cultural groups and their languages that existed in past Louisiana Constitutions (See Louisiana Constitutions 1845, 1864, 1868, 1921) the Louisiana Constitution of 1974 reversed these provisions to provide constitutional protection of "the right of the people to preserve, foster and promote their respective historic, linguistic and cultural origins" Louisiana Constitution 1974 Art. XII § 4.

115.    The Louisiana State Constitution provides that plaintiffs and their minor children are entitled to their civil liberties, an opportunity to the fullest development of their minor children as individuals,[14] and equal protection of the laws.[15] The actions of the defendants constitute willful and wanton violations of those constitutional provisions.

### B. The Defendants Violated the Public Trust Doctrine

115.    Article IX of the Louisiana Constitution states: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished in so far as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."

116.    As the Louisiana Supreme Court explained in *Save Ourselves, Inc. v. Louisiana Environmental Control Commission,* 452 So.2d 1152, 1157 (La. 1984), Article IX imposes a

---

[14] La. Const. Preamble: We, the people of Louisiana, grateful to Almighty God for the civil, political, economic, and religious liberties we enjoy, and desiring to protect individual rights to life, liberty, and property; afford opportunity for the fullest development of the individual; assure equality of rights; promote the health, safety, education, and welfare of the people; maintain a representative and orderly government; ensure domestic tranquility; provide for the common defense; and secure the blessings of freedom and justice to ourselves and our posterity, do ordain and establish this constitution.

[15] La. Const. art. I, § 3: No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.

substantive obligation to act in a manner that assures the "adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare."

117.    As the Louisiana Supreme Court further explained in *Save Ourselves, Inc., id.*, Article IX also imposes a procedural duty to engage in a balancing process in which "environmental costs and benefits are given full and careful consideration along with economic, social and other factors."

118.    Article IX applies to protect peoples, just as it protects our most treasured flora, fauna, and habitat.

119.    A continuation of the Pointe Au Chien Indian community and its unique language and culture forms a critical and indeed foundational part of the historic quality of south Louisiana's coastal environment.

120.    A tribal education serves to assure the continued existence of this unique Native American community and to protect its unique language and culture.

121.    Withdrawing this tribal education undermines the cohesion of this unique community and poses a grave threat to its continued existence, which itself constitutes an integral part of our cultural landscape and historic environment.

122.    The defendant failed and refused to act in a manner that minimized the damage to the cultural landscape and historic environment protected by the Article IX of the Louisiana Constitution, failed to consider the implications of its actions on the cultural landscape and historic environment protected by Article IX of the Louisiana Constitution before deciding to close the school and/or unlawfully ignore the applications submitted for a French emergence education, and failed to comply with the procedural requirements of Article IX by failing to develop a record,

determine facts and conclusions, and provide written reasons demonstrating its consideration of these substantive and procedural obligations.

## THIRD CAUSE OF ACTION
## ENTITLEMENT TO A WRIT OF MANDAMUS ON ACCOUNT OF
## DEFENDANTS' FAILURE AND REFUSAL TO COMPLY
## WITH THE IMMERSION SCHOOL CHOICE STATUTE

123.    Two named plaintiffs and others twice petitioned the defendants to create a French

Immersion Program for 2018-2019 and 2020-2021. Despite verbal assurances that a French

Immersion Program would be established, the program has unlawfully not been established.

124.    Plaintiffs, in accordance with La. R.S. 17:273.3.C.(2)(a), are entitled to the

implementation and establishment by defendants of a French Immersion program in Terrebonne

Parish at PAC Elementary and to an appropriate order of mandamus and injunctive and other relief

by this Court ordering such implementation and establishment of a French Immersion program.

Plaintiffs are entitled to an immediate hearing.

125.    The TPSB should be ordered to immediately accommodate all students who applied

in 2018 or 2020 and establish and implement a French Immersion Program in accordance with La.

R.S. 17:273.3.C.(2)(d).

126.    La. R.S. 17:273.3.C.(2)(e) further requires that:

> The local school board shall inform the parents and legal custodians of all
> students enrolled in the school system about the existence of any newly established
> foreign language immersion program and shall permit all eligible students to apply
> for the program during the designated enrollment period for the school year.

Accordingly, the TPSB should be ordered to offer this choice to PAC Elementary students and to

prominently advertise this program on their website. The TPSB should also be ordered to

individually contact all applying parents about the opportunity to enroll in this program. This and

the implementation of the French Immersion program should be at the sole cost of the TPSB.

127.    The TPSB should also be ordered to undertake such steps and procedures as may

be necessary so that the French Immersion Program can begin and be fully implemented in August

of 2021 or as soon thereafter as possible. Under any and all circumstances, children who enroll in

the program should have their rights protected and should be able to join the program as soon as it commences.

128.    The TPSB should be barred from doing anything that would hinder the objective of the statute, which is to promote "higher overall academic achievement," "higher levels of self-esteem," and "positive effect[s] on intellectual growth," and to "provide a better understanding of the state's social traditions and serve to promote, preserve, and develop our unique bilingual culture."[16]

129.    Writs of mandamus should be issued because the delay involved in obtaining relief by ordinary process may cause injustice. These matters should be set immediately or as soon as possible

### FOURTH CAUSE OF ACTION
### ISSUANCE OF AN APPROPRIATE TEMPORARY RESTRAINING ORDER PROHIBITING PERMANENT CLOSURE OF PAC ELEMENTARY AND PROBIBITING REFUSAL TO ESTABLISH A FRENCH IMMERSION PROGRAM AND, AFTER DUE PROCEEDINGS, ISSUANCE OF PROHIBITORY AND MANDATORY RELIEF THAT A FRENCH IMMERSION PROGRAM PROCEED AS PROMISED AND REQUIRED AND ORDERING THE PAC BE REOPENED AND MADE A FRENCH IMMERSION SCHOOL AS SOON AS POSSIBLE

130.    Plaintiffs are entitled to the immediate issuance of a temporary restraining order prohibiting implementation the closure of PAC Elementary and its dismantling or sale and to

---

[16] La. R.S. 17:273.3.B.(1)-(4): (1) Research indicates that students who participate in foreign language immersion programs, particularly French, demonstrate greater levels of proficiency in the English language, higher overall academic achievement, and higher levels of self-esteem.

(2) Learning a second language has a positive effect on intellectual growth and increased awareness of diverse cultures through access to history, art, and literature.

(3) Students in foreign language immersion programs have been shown to demonstrate enhanced cognitive functions in solving complex problems and mathematical computations through the development of more divergent and higher order thinking skills.

(4) In Louisiana, French language development and French language immersion programs, in particular, provide a better understanding of the state's social traditions and serve to promote, preserve, and develop our unique bilingual culture.

establish a French Immersion Program beginning in the 2021-2022 school year. In support of said temporary restraining order, many of the plaintiffs have signed appropriate verification of the truth of the specific facts pleaded herein in the form of affidavits and declarations to be filed herewith.

131.    Plaintiffs are further entitled to a prohibitory and mandatory preliminary injunction and thereafter a permanent injunction against defendants requiring that they cease their violations of law.

**FIFTH CAUSE OF ACTION**
**DETRIMENTAL RELIANCE AND DELIBERATE MISREPRESENTIONS**

132.    The actions of the defendants, as described, *supra*, establish causes of action for detrimental reliance and deliberate misrepresentation which has caused damage to plaintiffs.

**DEMAND**

Plaintiffs, Teddy Billiot, Mary Verdin, Liza Naquin, Tasha Dardar, Jade Billiot Bergeron, Lanny Dardar, Candace Hendon, Kelly Naquin, Loretta Verdin, Casey Dardar, Shana Rae Dardar, and Joan Brunet, demand judgment against the defendants as set forth above and as follows:

1.    Ordering that the defendants be commanded to comply with their obligations, as described above under the laws and Constitution of the United States and under the laws and Constitution of Louisiana;

2.    For actual and punitive damages plus applicable legal interest and reasonable attorney's fees;

3.    For all just and equitable relief to which plaintiffs may be entitled.

Respectfully submitted,
KOERNER LAW FIRM
/s/ Louis R. Koerner, Jr.,
Louisiana Bar 7817
1204 Jackson Avenue
New Orleans, Louisiana 70130-5130
(504) 581-9569 (New Orleans)
(504) 405-1411 (Cell)
(504) 324-1798 (Fax)
koerner@koerner-law.com
URL: www.koerner-law.com

DOMENGEAUX WRIGHT ROY & EDWARDS
/s/ James H. Domengeaux, Sr.
Bar Roll No. 17555
556 Jefferson St., Suite 500
Post Office Box 3668
Lafayette, Louisiana 70502
(337) 233-3033

Attorneys for Teddy Billiot, Mary Verdin, Liza Naquin, Tasha Dardar, Jade Billiot Bergeron, Lanny Dardar, Candace Hendon, Kelly Naquin, Loretta Verdin, Casey Dardar, Shana Rae Dardar, and Joan Brunet